May it please the Court, Counsel, I am here today on behalf of the individually named defendants in this case, Kerry Weisenberger, Becky Guffin, Camille Call, Renee Rausch, Colleen Murley, and Michael Newbert. This case concerns either two or three errors by the District Court, depending upon how the District Court's decision is construed. First, the District Court incorrectly determined that Kerry Weisenberger is not entitled to qualified immunity as to the claims that she violated the plaintiff's Fourth Amendment rights. Under the second prong of the qualified immunity test, there is no robust consensus of Fourth Amendment case law concerning unreasonable seizures in the school setting, which would inform an educator in Ms. Weisenberger's position that her actions violated the Constitution. Second, the District Court incorrectly determined that Ms. Weisenberger was not entitled to qualified immunity as to her claim that she violated plaintiff's Fourteenth Amendment rights. There is neither Eighth Circuit nor South or Supreme Court authority which would support a conclusion that the actions at issue in this case shocked the conscience, nor is there Eighth Circuit or U.S. Supreme Court authority which would support a Fourteenth Amendment due process claim when the plaintiff brings forth no admissible evidence of injury. Finally, to the extent that the District Court kept alive any of the claims against the supervisor defendants, these individuals should have been entitled to qualified immunity. To the extent. Would you address what your thoughts are and who is still in the case as far as the supervisory defendants are, and where do I look to get the best evidence of that? You would look in the District Court's decision. However, I think there is conflicting language as to whether it is just Kerry Weisenberger who is in as to the Fourteenth Amendment claim or whether it's all of the supervisory defendants as well. And I outlined that in my brief, but I can't definitively distill from the District Court's decision what the intent was as to whether he intended to keep those other defendants in. I will say that there is no evidence that any of the supervisory defendants had any involvement with the alleged acts in the complaint. And so I can't fathom how they could be individually liable in this case. However, the language was confusing from the District Court's decision, and that's why I've added this as an issue, a third issue if necessary. We only get one shot at qualified immunity, and we did not want to show up at trial and find out that we had individual claims that were still alive. Was there any thought given to asking the District Court for some clarification? I did give that thought. I will say that Judge Korman, I clerked for Judge Korman, and he serially dismisses motions to reconsider as not authorized by the Federal Rules of Civil Procedure. And so I knew what the response was likely to be to a motion like that, and so I did not take that step. Would he consider a motion for a more definite statement of the ruling to be a motion to reconsider? Do you think? I mean, I'm just saying, as an old district judge, I mean, if somebody said, we don't understand your order, Judge, could you please explain? I would view that different than, I want you to make a new decision. And that's fair. And I guess what I would say is that we're making the argument in the event that this Court would construe his decision to say these supervisory defendants are still in. Okay. Turning to the Fourth Amendment portion of our argument, our main argument, and the argument that I think the District Court either overlooked or erred on, was that there is no robust consensus of case law that establishes that Weisenberger's actions in this case violate the Fourth Amendment protection against unlawful seizures. And I think if you look at the briefing in this case, one thing really drives this home. This Circuit has adopted a local rule that requires that the statement of issues include a list of the most apposite cases. Plaintiffs listed three cases under their recitation of the Fourth Amendment issue. The first one was Heidemann v. Roether, and this is the only Eighth Circuit case that the plaintiff lists. And although Heidemann is listed under the Fourth Amendment issue, it did not discuss the Fourth Amendment. It discussed the substantive due process clause under the Fourteenth Amendment, as well as equal protection. In that case, the Court reversed the denial of qualified immunity, concluding that a reasonable official would not have understood the conduct to be a substantial departure from professional norms. The second case that the plaintiffs list is H.H. v. Moffitt, which is an unpublished Fourth Circuit case, and that's one that the district court relied upon in denying qualified immunity. That also was a substantive due process case, and it had some pretty sensational facts that had to do with educators maliciously conspiring to deprive the student of educational opportunities and making horrible statements right to the student's face, things that this record does not contain as it relates to students A.A., B.B., and C.C., who are the ones who are up for consideration in this appeal. And finally, the third case that plaintiffs listed was T.W. v. School Board of Seminole County, and this is an Eleventh Circuit case that also involves the Fourteenth Amendment. There's no discussion of the Fourth Amendment. And once again, even in that case, with the egregious facts that existed there, the Eleventh Circuit upheld qualified immunity in favor of the educator. Go ahead. Isn't there an obvious clarity issue here that's really part of this discussion? If we really think about it, what we have here is most of the cases that are out there that you cite in your brief are all cases in which there is an IEP, and in that IEP there is a restraint and use of restraint provision in the IEP. And that's not the case here, right? And so now you're looking at putting them in the little room. It's all about putting them in the little room for the purposes of meeting some other educational or personal safety need or safety of other need, right? And so all of a sudden it's a very different thing. And so when you're hauling these kids off to put them in the little room for extended periods of time, it's not authorized by the IEP. And so now you're dealing in a place where it's just about policy, and the cases that you're citing to are all places where there was something that was authorized, right? And so, well. Just a point of clarification, I think Student AAs IEP did discuss the specific use of the little room. Later. Not initially, right? It was added later, and it was, you know, and by then constitutional harm may very well have been done, right? Because there's a whole series of incidents that take place before the amendment takes place that authorizes it. And then there's real questions about what the purpose was for it, how it was explained. I mean, the parents all contend that they were told that it was, you know, not being used like consistently as a disciplinary tool, but rather it was an educational safety thing, right? That they were just brought somewhere else to, AA was being brought somewhere else to, I can't remember the exact language, I'd have to, I'd have to read. Well, and I think, I think the little room was used for both. I mean, I think that the evidence would bear that out. However, I think even looking to the case law where the parameters of the IEP have been exceeded, courts have still come short of determining that that is a, you're violating clearly established law by going outside the bounds of an IEP. I think the A.T. v. Baldo case out of the Ninth Circuit even made reference to the fact that even, even exceeding the IEP is not a violation of, of clearly established law. So I, I don't think, even, even with an arguable violation of IEP protocol or parameters, I don't think that's, that gets you past the second part of the qualified immunity inquiry. Well, let me ask you this. It seems, if I'm reading the brief correctly, that there's two types of, of alleged violations here. One is use of the seclusion room excessively, and that applies to AA and I believe BB. I don't think CC was in the seclusion room. But as to, particularly as to BB and CC, you have allegations of almost assault. You're throwing them in the pool, stripping their clothes off, threatening to stomp on their fingers or actually prying their fingers off. I mean, to me, though, that's pretty clearly established. You can't assault a student. Well, I mean, if you look at the, and I think as to the latter category that you're describing, I think that goes more to the Fourteenth Amendment substantive due process issue as opposed to seclusion or, or confinement, those types of things under the Fourth Amendment. And if you look at some of the cases that have been decided, I, I don't know that even in the category of assault, if you want to call it that, if, if that's clearly established or conscious shocking would be the better way to phrase it, I think. You get into cases like TW versus School Board of Seminole County or one that I, I found as I was looking at, or as I was preparing for this argument, Domingo versus Kowalski, which is a Sixth Circuit case from 2016. Those cases have fact patterns which involve very clearly situations involving assault or stepping outside the bounds of what would normally be pedagogically recommended behavior. And yet the Fourteenth Amendment due process claims fail. I want to talk just a minute about the case that the district court relied upon, H. Hays versus Moffitt, and why that's distinguishable. You know, there, there is nothing in this record that demonstrates the type of malice that existed in Moffitt as to the students that are still in this appeal. You know, the claim in, in Moffitt was that these teachers who were recorded doing this were, were plotting against the student in order to deprive them of, of educational opportunities. And here, I, I think the evidence actually shows when you're talking about the, you know, the swimming pool and, and things like that and, you know, getting the kids to participate in gym, it's really the opposite direction. And Weisenberger was trying, perhaps overzealously, trying to get these kids to, to engage in the educational opportunities they were being offered. I think that's what, what makes this case distinguishable from the, the Moffitt case. Among other things, I mean, I, I don't think, as to students A, A, B, B, and C, C, we certainly didn't have the kind of egregious statements or, or malicious conduct that, that happened in the H. Hays case. And that was really the only case that the district court relied upon in, in concluding that qualified immunity should not apply. The final thing I want to address with my last 15 seconds here is just the, the notion that the, the plaintiffs are not able to revive their supervisory liability claim in the context of this appeal. We, the, the portion of our argument relating to those other supervisor defendants was solely as to whether or not the district court intended to keep them in as to their individual acts. That does not open the door to a cross-appeal, which was not filed. There was no Rule 54b certification made, and this Court would not have jurisdiction to entertain that portion of, of the plaintiffs' appeal, or the, the appeal here. So I just wanted to end on that, and I'll reserve the rest of my comments for rebuttal, unless the Court has questions. Thank you. Ms. Cain. Good morning, Your Honors. Counsel. I want to, I've got the, my responses all laid out, but I do want to respond on a couple of issues that the Court raised. Specifically, I want to start with a review that's actually permitted on an interlocutory appeal for qualified immunity. That review on appeal is considered a de novo independent review, and can just simply look at those facts that have already been provided. In addition, I would argue that there's tension between your jurisdiction for interlocutory appeals under 28 U.S.C. 1292 and Rule 5 for appellate procedure, and I would point the Court to Yamaha Motor Corp. v. Calhoun, 516 U.S. 199, Supreme Court, 1996. It says, as the text of 1292 indicates, appellate jurisdiction applies to the order certified on appeal. Therefore, the appellate court may address any issue fairly included within the certified order. Now, of course, you can't reach back into summary judgment motions that are not subject to the jurisdiction of the interlocutory appeal on qualified immunity. So I want to be clear about that. That's why we raised the issues. And the Court asked a question about supervisory liability and where you could find it in the record, and I want to address that. In fact, the supervisory liability, I'm just going to leap off on this point right now because I think it's relevant. It's clear that, in fact, in this case, they had actual notice of the allegations that took place. And the record is before this Court, and I would start with, prior to Wexel reporting Solberg-Wexel reporting directly in writing to defendant Call, then consequently reported to defendant Guffin, or appellant Guffin, Jane Doe, in this case, actually met with Call on September 18th, and you can find this in the appendix 425, paragraph 4. She reported that not only did she see Ms. Weisenberger forcibly yanking a child's arm at the pool, but that she also witnessed her daughter cowering from an aide at the pool. And this was all reported on September 18th, 2004. Going back to Judge Kovas' first question, what are you responding to at this point? Do you believe that Judge Corman denied qualified immunity, and so you're defending the school district's assertion of qualified immunity, or are you, in essence, cross-appealing a grant of qualified immunity? What do you think Judge Corman did? My understanding is that a de novo review is not dependent upon what the judge did below. And so I argue that this is an open issue that the court has to look at. Now, it was a light bulb that went off when you suggested clarification of the order, and frankly I didn't have the ability to think of that at that time, but according to the de novo review, it's an independent review. And so my arguments are towards an independent review of the certified order related to qualified immunity, as Yamaha suggests. Well, but it's not a cert—well— It says, therefore, the appellate court may address any issue fairly included within the certified order. And so I've actually stepped off away from the district court's decision. I can certainly talk to you about it, but I'm actually here to present what we believe is an accurate record in support of the claims that we've raised, and those include supervisory liability. And the court asked whether there was a record before the court on supervisory liability. So I'm going to tell you that in fact, one of the errors we think the court made with regard to the supervisory analysis that appears to be somewhat curtailed is he relied on case law that was the result of what we call constructive notice, not actual notice. In this case, actual notice in writing was given to the supervisory appellants, and it was given over a period of time. And I was just walking you through that notice that took place, and you can find it in the various documents that Ava Wexel provided at APP 115 through 116. And then she followed up again after her initial report directly to her supervisor and call on April 8, 2015. At that time, she reported that a child was being forcibly stripped and dressed, threatened with being thrown into the pool, that E.E. was being tied to a chair and responding by screaming and crying, that all the children were being chased and moved, physically moved by personnel, and that children were not a danger to themselves, and that people were grabbing children with autism by their chin and rebuking them for not making eye contact. She then follows up a month later at APP 117 that children aren't going to the mainstream. They're not being prepped for class. I mean, she's refusing to teach in the classroom. She's grabbing by the arms, jerking children around the room, yelling and shouting, derogatory and negative gossip about the children. And it continues, making nasty, telling a child that he's nasty and is drool, a consequence of his disability, is disgusting and sick, checking a child's underwear on a daily basis and reporting that she's smelly and her underwear is the same, letting them nap, making personal calls. And the reason I raise all this is because one of the questions is, was the conduct of WEXL plainly incompetent? And I would suggest to you that based on the reports and the notice that was given that the Aberdeen supervisory defendants, they had more than adequate notice because not only does WEXL follow up, but she follows up again at APP 119 on February 4th and 16th. She specifically reports that children are being stripped and forced into the pool, dragged to the pool by their arms. And then, and she records another incident of dragging and forcing into the pool. Then after WEXL makes a report, the speech-language pathologist who goes into the classroom sends an email to Molsom and Call on September 27th, 2015, APP 120, children are sleeping in the classroom, lights off, watching videos, and WEXL's frustrated with the children. On September 14th, 2014, Belafuel, an aide, sends an email to Call December 14th, 2015, APP 122, a separate room is being used for refusing to follow directions. Weissenberger's wandering in and out of the classroom. So there's a long list of actual notice given. And so I'm stymied by why the court relied on its decision and anybody else would rely on KD v. Douglas, Gebser, even Gebser v. Lagavisto is a constructive notice issue, Flaherty, PH, and KC. There's no reason to rely upon that because it's not a constructive notice issue. Those are all constructive notices. So they had actual notice, there's no question. And the arc of misconduct that we're alleging the supervisor liability has nothing to do with the independent actions of employees, but the misconduct of the employee in conjunction with their failure to respond in any reasonable way. Now that's the essence of reckless disregard. There's no question in this record that the supervisory defendants were, appellants had sufficient evidence of what was happening and just disregarded the risk of the constitutional harm. Despite the fact, by the way, that they all agree that the use of physical restraint and involuntary confinement with children with disabilities is a state-created danger. That is, it's subject to abuse, it's known to be subject to abuse, it's known to be harmful, and these children were then subjected to it. And one of the things that appellants raise is the professional standards. And I tell you, professional standards are the touchstone. Not necessarily controlling, but the touchstone for us to understand what notice is and what the effective response is. There is no argument available that the Fourth Amendment protection against unreasonable seizures and involuntary confinement has been found over and over again by the Supreme Court of the United States. The question is, is it applicable in, or have we found cases that are applicable with respect to public schools? Well, we have, and certainly we have Shade, which we've referenced, and Couture. We also say that Heidemann v. Rother, while dealing with the Fourteenth Amendment claim, recognizes the freedom to be, the right to be free from restraints and involuntary confinement. They didn't find it to be the case in Heidemann v. Rother because the IEP authorized the use of restraint and involuntary confinement. The Court is correct that in this case, the use of the physical restraints and involuntary confinement, first of all, the Court should know there is absolutely no record reflecting what was going on in that classroom. And why was it not? Because there was no policy. The supervisory liability, or the supervisory defendants, and I think this is important for the Court to, in my opinion, to understand that the only way the public agencies are going to function appropriately is if we put well-educated, well-trained, and knowledgeable individuals who rise through the ranks by merit, and they understand their own policies and procedures, as well as their own fragilities within the administrative organization. That simply didn't take place here. You can't have people turning away from these kinds of circumstances. Not only did they turn away from what happened to these children in the Enrich II classroom, but they turned away from the circumstances in which A.A. was left in urine-soaked clothing for in excess of five hours on several occasions. They refused to intervene. Refused to intervene. Now, Rausch testified, in fact, that if that were true, it would be shocking. Now, if it were true that the child was left in urine-soaked clothing for more than a few minutes, she would be both alarmed and shocked. Defendant Guffin, or Appellant Guffin, testified that if the allegations in Wexall's repeated notices, as well as other professionals, to the school personnel were accurate, she would agree that it was abuse, physical abuse, of these children. It's clear in the record that had they looked, they would have found. When they looked, there's no record. When they did finally look, and one of an example of when they did look, which is really despite all these allegations of abuse and physical mistreatment, that plan of assistance, their opportunity to address these conditions, was silent about all the allegations from other professionals in the school setting. So they had noticed, and they failed to act, and this record is replete with support for that. Can I ask one question? I understand your argument about no records, but where does the number 274 come from if there's no records? At the end of the school year, in 2016, I believe it was February, the mother went to an IEP team meeting and started asking what's going on with this little room. She was informed for the first time that when you looked at the daily logs, when there's two frowny faces together, or two frowny faces on the daily logs, the child is placed in seclusion, or as they call it, involuntary confinement. But that was in February of 2016, two years after these children had been subjected to this same pattern and practice. And it's, by the way, ironically, the same time that the Behavior Intervention Report for AA is amended to reflect the use of the little room. So I'm running out of time here. I don't think there's any question that a Fourth Amendment unreasonable seizure and confinement case sounds in this corridor that's been long recognized. There's no question that this kind of behavior would never be tolerated by a child who could actually report what's happening to them. And that's the other issue, too. These children can't report what they were experiencing. There was no way for them to report. They didn't have the verbal skills to do so. And so everything would have been driven by what was happening in that classroom and the recording of these uses of physical restraints. And I want to talk to you, when it's outside of that IEP, if it's not recognized as an There is a bright-line rule. That bright-line rule is in emergencies when the child does harm to himself or others. And that bright-line rule is applicable to both disabled and non-disabled children alike. It isn't confined just to the disabled. The fact that they interfered with these children's bodily integrity by excessively restraining, confining them, dragging them, there must be some relief for the constitutional harm that took place not only to their education, but their liberty. Their liberty to be free of bodily interference for whatever arbitrary, capricious, non-pedagogical reason. And the responsible individuals failed, miserably failed these children. Harm is associated with a constitutional interest. It's intended to protect. It does not require a physical injury. Thank you. Rebuttal, Mr. Peterson. Yes, Your Honor. First of all, the fact that this qualified immunity denial is reviewed de novo does not broaden the scope of the issues in this appeal. There was no cross-appeal filed by the plaintiffs in this case. And to suggest that this can be used to review an entirely separate issue that's not subsumed in a qualified immunity analysis flies in the face of several Eighth Circuit cases that I cited in our brief. The thing that I did not hear from Ms. Cain during her argument was any robust consensus of cases which would inform somebody such as Weisenberger that the actions taken here relating to the use of the timeout room or, you know, getting kids to swim or anything like that would inform her that she's violating the Constitution. And that's why we're here today. The issue of the appeal is the second part of the qualified immunity test, which is whether this is clearly established law. And that's — that was the entire basis of our argument on appeal. And I did not — and I did not see it in the brief. I did not find any analogous case law that suggests that what we're seeing or what allegations that are supported by admissible evidence in this case would constitute a violation of clearly established law. The final thing I want to address was the very last comment by Ms. Cain regarding the lack of a physical injury. It's actually the lack of any injury that we're arguing here. And the reason I say that is because not only did there — was there no evidence of physical injury presented in support of a 14th Amendment due process claim, there was no evidence — there is no remaining evidence of psychological harm because the plaintiff's expert has been stricken. And so they can't come forward with any evidence of injury whatsoever. And I don't know of any 14th Amendment substantive due process claim which has survived in the face of absolutely no injury. For these reasons, Your Honor, we would respectfully request that the district court's decision be reversed and the case be remanded for dismissal of the individual defendants. Thank you. Thank you.